IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

BASILLO GARCIA                          §
    TDCJ-CID #598955                §
v.                                      §            C.A. NO. C-10-311
                                   §
JAMES HACKMAN, ET AL.                   §

**OPINION REGARDING MOTIONS FOR SUMMARY
JUDGMENT, FOR A PRELIMINARY INJUNCTION AND FOR LEAVE TO AMEND**

    This <u>pro</u> <u>se</u> civil rights action was filed pursuant to 42 U.S.C. § 1983 by a state prisoner

alleging that Defendants Hackman and Crites retaliated against him for filing grievances.  (D.E.

1).  Pending are the parties' cross-motions for summary judgment, (D.E. 20, 25), as well as

Plaintiff's motion for a preliminary injunction, (D.E. 17), and his motion for leave to amend.

(D.E. 28).  For the reasons that follow, the motions for summary judgment and a preliminary

injunction are all denied, the motion for leave to amend is denied in part and granted in part, and

this matter will proceed to trial.

## I.  <u>JURISDICTION</u>

    The Court has federal question jurisdiction over this civil rights action pursuant to 28

U.S.C. § 1331.  After consent by the parties, (D.E. 10, 15), the case was referred to a magistrate

judge to conduct all further proceedings, including entry of final judgment.  (D.E. 16); <u>see</u> <u>also</u>

28 U.S.C. § 636(c).

## II.  <u>PROCEDURAL HISTORY</u>

    Plaintiff is an inmate in the custody of the Texas Department of Criminal Justice

("TDCJ")-Correctional Institutions Division, currently incarcerated at the McConnell Unit in

Beeville, Texas.  He filed this action on September 23, 2010.  (D.E. 1).  On October 29, 2010, a

Spears[1] hearing was held.  Defendants filed an answer on December 8, 2010.  (D.E. 13).

On March 25, 2011, Plaintiff filed a motion for a preliminary injunction.  (D.E. 17).

Defendants filed a motion for summary judgment on April 7, 2011.  (D.E. 20).  On April 8,

2011, Plaintiff filed a supplement to his complaint.  (D.E. 21).  Defendants filed a supplement to

their motion for summary judgment on April 18, 2011.  (D.E. 23).  On April 20, 2011, they filed

a response to the motion for a preliminary injunction.  (D.E. 24).  Plaintiff filed a cross-motion

for summary judgment on April 27, 2011, which–because the time for filing a response has

lapsed and because it is responsive to Defendants' motion–is construed as a response to their

motion for summary judgment as well.[2]  (D.E. 25).  On May 9, 2011, they filed a response to

Plaintiff's cross-motion for summary judgment.  (D.E. 27).  Plaintiff filed a motion to amend the

complaint on May 16, 2011.  (D.E. 28).  On May 18, 2011, he filed a reply to Defendants'

response to his motion for summary judgment.  (D.E. 29).  They filed a response to Plaintiff's

motion for leave to amend on May 25, 2011.  (D.E. 30).

### III.  <u>FACTUAL ALLEGATIONS</u>

Plaintiff alleges that Defendants engaged in a pattern of retaliatory conduct in response to

his filing of grievances, including deliberately failing to properly place an order for craft shop

equipment, disciplining him for tattoos that he acquired years earlier, unfairly suspending him

---

[1] <u>Spears v. McCotter</u>, 766 F.2d 179 (5th Cir. 1985), <u>abrogated</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Neitzke v. Williams</u>, 490 U.S. 319, 324 (1989); <u>see</u> <u>also</u> <u>Eason v. Holt</u>, 73 F.3d 600, 603 (5th Cir. 1996) (testimony given at a <u>Spears</u> hearing is incorporated into the pleadings).

[2] Plaintiff's motion to amend the complaint, (D.E. 28), and his reply to Defendants' response to his cross-motion for summary judgment, (D.E. 29), are also responsive to the motion for summary judgment, and the allegations and evidence therein are taken into account in ruling on Defendants' motion for summary judgment.  <u>See</u> <u>Parker v. Fort Worth Police Dep't</u>, 980 F.2d 1023, 1026 (5th Cir. 1993) (per curiam) ("'<em>Pro se</em> prisoner complaints must be read in a liberal fashion....'") (citations omitted).

from the craft shop, and ultimately revoking his privileges there for practices that they long knew

about and condoned, as well as punishing him with the loss of commissary and recreation days

for those same practices.  (D.E. 1).  He asserts that Defendants' actions violated his rights under

the First, Fifth, and Fourteenth Amendments to the United States Constitution, as well as his

state law right to be free from the unlawful conversion of his property.  Id.  Plaintiff seeks an

injunction ordering Defendants to refrain from further retaliation and to allow him to return to

his work at the craft shop, as well as compensatory and punitive damages for his losses and

injuries, which include ulcers induced by the stress of his ordeal, and the nine hundred dollars

that he could earn from the sale of the confiscated items.  (D.E. 1, 11).

## IV.  SUMMARY JUDGMENT EVIDENCE

Plaintiff has attached to his motion for summary judgment nine receipts dating from

November 19, 2008 to April 14, 2010.  (D.E. 25-4, at 2-5).  In type-written print, each

"certif[ies] that the craft work listed is a bona fide gift to the person listed on my Visiting List

who is receiving the items" and each notes that "[p]ermission is granted by the Warden on the

basis of this statement for the items to be removed from the unit."  Id.  They also include a hand-

written list of items, and each list in turn has both items that would be routinely made of wood

and items that would routinely be made of leather.  Id.[3]  Many of the wooden items include the

material in their description, and some of the leather items do as well.  Id.  Each receipt also has

a handwritten indication that the gift is for Lucia Campos, Plaintiff's fiancee.  Id.

On March 29, 2010, Grizzly Industrial, Inc. sent Plaintiff a letter, noting that intra-prison

request forms for a drill press and two other objects had been mistakenly sent to the company,

---

[3] The most common items that appear throughout the receipts are wallets, purses, clocks, "coozies," and
plaques.  (D.E. 25-4, at 2-5).

instead of a copy of the company's order form and a check.  (D.E. 20-3, at 20-21).  It informed him that the order had been placed on hold pending receipt of the payment.  Id. at 20.

On April 12, 2010, Plaintiff filed a grievance complaining that Defendant Hackman deliberately refused to process his order for a drill press and subjected him to "stipulations that other wood craftsmen do not have to follow," actions that he attributed to his personal animus. Id. at 13-14.  As relief, he requested only that he "be treated fairly and not discriminated against," that his order be processed promptly, and that he be free from "further harassment or reprisals of any kind."  Id. at 14.  On April 14, 2010, Defendant Hackman wrote a statement noting that the order had been inadvertently "mixed up" with the regular mail and sent directly to the company, and that Plaintiff had been advised to submit a new order.  Id. at 17.

Although there does not appear to be any formal record of the decision, the parties agree that Plaintiff was suspended from the craft shop on April 15, 2010, ostensibly for sending out both leather and wooden items in the same box.  (D.E. 25, at 3; D.E. 27, at 1).

On April 15, 2010, Plaintiff was observed "in possession of an undocumented tattoo" of a female figure, the name Lucy, and two roses, located on his upper left arm.  (D.E. 20-5, at 3-5). That same day, Major Rick Villarreal, an officer with the security threat group office, photographed the tattoo.  Id. at 6.  The next day, he completed an offense report, documenting that he noticed the tattoo while patrolling the craft shop and that Plaintiff admitted that he had gotten it recently to memorialize his commitment to his new wife.  Id. at 4.  Major Villarreal recounted that he conducted a review of Plaintiff's travel card and found no evidence that the tattoo had previously been documented.  Id.

Plaintiff attaches to his motion for summary judgment a sworn affidavit by Dennis Hunt, a fellow prisoner at the McConnell Unit, in which he swears that he overheard Defendant Crites tell Defendant Hackman on April 16, 2010 "that he was tired of [Plaintiff] writing grievance complaints against him and about the craftshop."  (D.E. 25-1, at 2).  He then heard Defendant "Hackman tell [Defendant] Crites that by the time [Plaintiff's] suspension from the craftshop ended, [he] would not want to file anymore [sic] grievance's [sic] against him or about the craftshop."  Id.

On April 23, 2010, Plaintiff pled guilty to the tattoo offense, though he was recorded as insisting that he got the tattoo "six to seven" years earlier.  (D.E. 20-5, at 3).  He received the loss of ten recreation days and ten commissary days as punishment.  Id.

On April 26, 2010, a TDCJ official, whose name is illegible on the form, drafted a "suggested response" to Plaintiff's April 12, 2010 grievance, echoing Defendant Hackman's statement that the mistake with the mail was an innocent product of human error and that Plaintiff had been instructed to re-submit the request.  (D.E. 20-3, at 16).  Defendant Crites replied to the grievance on April 27, 2010 with the suggested response, adding, "[n]o further harassment or reprisals of any kind."  Id. at 14.

On May 2, 2010, Plaintiff filed a Step 2 grievance, claiming that Defendant Crites' explanation of the mail mistake was "false and misleading" and designed "to cover-up wrong doing."  Id. at 26.  A "grievance analyst" identified as K. Tollette drafted a suggested response to Plaintiff's grievance on May 18, 2010, noting that the error had been inadvertent and that no further action was warranted.  Id. at 25.  On May 21, 2010, Barbara Trevino, an assistant

regional director, responded to the Step 2 grievance, essentially repeating the suggested response.  Id. at 27.

On May 28, 2010, Plaintiff submitted another Step 1 grievance, complaining that Defendants were denying him access to the craft shop in retaliation for prior grievances.  Id. at 3. In particular, he alleged that he received a thirty-day suspension from the craft shop on April 16, 2010, but remained barred from its facilities after the thirty days had passed.  Id.  He attributed this improper delay to his complaints regarding the tool order.  Id.  Plaintiff suggested that his area in the shop was searched, and Ms. Campos denied access to his gifts, for the same reason. Id.  He requested that he be provided with an explanation as to why he remained suspended, that Defendants cease retaliating against him, and that Ms. Campos be allowed to resume picking up gifts during her visits.  Id. at 4.

On May 29, 2010, Defendant Crites completed an official statement form, commenting that Plaintiff had been providing his visitor with "a lot of leather products that were made by various offenders, in an attempt to circumvent the craft shop supervisor."  Id. at 8.  He noted that he would review the case in ninety days.  Id.  On June 8, 2010, Defendant Hackman completed the same form, and provided essentially the same description of Plaintiff's offense.  Id. at 9.

On June 18, 2010, Tamara McCullough, a TDCJ grievance investigator, remarked in response to Plaintiff's grievance that he had been suspended for sending out contraband leather through visitations, which he was not permitted to do as a wood worker, that there was no evidence of retaliation, and that no further action was warranted.  Id. at 6.  Warden Jackson responded to the May 28, 2010 grievance on June 21, 2010, echoing these points.  Id. at 4.

6

On June 22, 2010, Ms. Tollette drafted a "suggested response to offender," indicating that Plaintiff "attempted to circumvent policy and procedures by attempting to send items not belonging to [him] out through visitation." Id. at 10. It noted that his "suspension is for 90 days" and that there was no evidence of retaliation. Id.

On July 4, 2010, Plaintiff filed a Step 2 grievance, noting that he had complained about both Defendants Crites and Hackman, and protesting that he was not given a suspension form indicating the start and end date of the punishment, nor any forms to log the items confiscated. Id. at 11-12. He further alleged that the tattoo was at least nine years old and thus did not warrant sanctions. Id. at 11. In addition, Plaintiff insisted that he had been approved to send out leather and wood items both for two years, and offered records to support that contention. Id. at 12. In light of these various alleged improprieties, and the temporal proximity between the grievance and the sanctions, he argued that retaliation was the only possible explanation. Id. at 11-12. On July 26, 2010, Juan Garcia, an assistant regional director, responded to the grievance, noting that it had been appropriately addressed at step one, reiterating the charges, confirming that the suspension "is for 90 days" and dismissing any claims of retaliation. Id. at 12.

On August 30, 2010, Defendant Crites sent Monica Bell, a McConnell Unit employee, a memorandum informing her that Plaintiff had been suspended from the craft shop for "sending his craft shop items along with other offender's [sic] craft shop items to be picked up by his girlfriend." (D.E. 20-2, at 3). The memorandum further explained that Plaintiff was "assigned as a wood-worker in the craft shop and was questioned when he was found to be sending out leather goods along with his items to be picked up by his girlfriend." Id. Moreover, it noted that his girlfriend was "on the visitation list of several offenders assigned to the craft shop and

therefore would pickup [sic] the additional items to sale [sic] for profits on behalf of the

offenders."  Id.  The memorandum concluded that Defendant Crites decided to suspend Plaintiff

from the craft shop for six months and that he would be reinstated on October 15, 2010.  Id.

According to an unsigned disciplinary report, on March 7, 2011, Plaintiff allegedly made

"an unauthorized commodity exchange" when he accepted two metal engraved plates and a large

painting, in direct violation of a previous order by Defendant Crites "to not send any craft item

out not pertaining to" his craft.  Id. at 3.  A preliminary investigation report completed on March

8, 2011, reflects that Plaintiff admitted that he had enlisted the help of other prisoners in painting

the objects.  Id. at 5.  However, in a March 8, 2011 offense report, Sergeant Marcon related that

Plaintiff told him he had done the metal engraving and the painting himself.  (D.E. 24-2, at 4).

On that same day, TDCJ officials compiled a list of Plaintiff's tools, indicating that he was in

possession of more than a hundred instruments of varying complexity and value.  (D.E. 21-1, at

1).

Plaintiff pled not guilty to the "commodity exchange" offense and noted in his statement

that he believed the charge was retaliation for this lawsuit.  (D.E. 24-2, at 3).  He was

nevertheless found guilty on March 10, 2011 and punished with the loss of fifteen recreation

days and five commissary days.  Id.

On March 21, 2011, Defendant Hackman sent a memorandum to Warden Guterrez,

explaining the revocation of Plaintiff's craft shop privileges.  (D.E. 24-1, at 3).  He cited Section

IV of the "Craftshop SOP and A.D. 14.59" as stating that "[o]nly items made by the offender

will be allowed to be sent out."  Id.  He noted that Plaintiff had two minor cases against him

within a year-long period, that he had been told twice before that he was not permitted to send

out items "not belonging to him" or "not related to his craft," and that he had recently sent out two painted, engraved plates, for which he had only provided the wood and for which he had not obtained permission.  Id.  Defendant Hackman indicated that Plaintiff had argued that he was permitted to paint on wood and send it out, and he had replied that such an explanation was only valid where the inmate did the painting himself.  Id.  He observed that Plaintiff received a one-month suspension eighteen months prior "for not having an account and up to date tool inventory during a security audit."  Id.  Defendant Hackman explained that an inmate is permitted to purchase items unrelated to his craft, and work with another offender on a project, but "only if the original craftsman purchased the material for his project and permission has been granted by the Craftshop supervisor."  Id.  He concluded that Plaintiff "continues to have Craftshop infractions and also violate unit Craftshop policy.  His behavior continues to be problematic and have wreckless [sic] disregard to [sic] regulation."  Id.

On April 8, 2011, Defendant Hackman sent Warden Guterrez another memorandum.  Id. at 4.  He explained that Plaintiff had been allowed back into the craft shop with all his tools and materials in November 2010, but that on March 14, 2011, he was "administratively removed due to a craft shop rule violation" because he "was sending out thru visitation an item that two other offenders had given him material and did most of the work on."  Id.  He observed that Warden Guterrez agreed to store Plaintiff's property until the case was resolved, but that if the outcome favored TDCJ he "will be required to send property home due to the [second] craft shop rule violation."  Id.

A TDCJ administrative directive outlines the policies and procedures regarding "offender piddling and craft sales."  (D.E. 20-4, at 2-15).  It provides that access to craft shops is provided

on a first-come, first-served basis or, at the warden's discretion, on an alternating schedule.  Id. at 2.  Each warden determines from an approved list the craft sales that may be conducted at the unit.  Id.  The directive specifies that wardens are required to "develop and implement a specific operational procedure detailing the approved unit/facility procedures for handling craft sales." Id.  It then provides a "standardized craft list," which includes leather and wood finishing.  Id. at 2-3.  A warden is allowed to deviate from the listed programs by request to a regional director. Id. at 3.

With respect to the suspension of piddling privileges, the directive begins by noting that "participation in the unit/facility Piddling Shop is a privilege and as such the Warden may at any time revoke or suspend an offender's piddling privileges."  Id. at 5.  It further observes that inmates must abide by "all safety precautions and requirements."  Id.

The directive includes a section on raw materials, which mandates that every warden must create and post "[a] policy detailing the procedures for placing raw material orders and an approved vendor's list."  Id.  A separate section concerning sales includes the provision that "Special Orders for custom-made goods may only be accepted by the Warden or his designated employee.  Special Orders may be accepted from persons other than TDCJ employees (i.e., visitors)."  Id. at 9.  It notes that "[a]ll Special Orders are subject to restrictions as deemed necessary by the Warden."  Id.  The directive provides that "there shall be no limit, unless imposed by the Warden, on contract (Special Orders) sales for custom-made goods."  Id. at 10. It concludes that "[a]ll craft sales between offenders are at the discretion of the Warden.  A sale may be prohibited by the Warden without justification to the offender.  A sale or trade of a craft item without approval is a trading and trafficking rules violation."  Id. at 10.  Moreover, "[n]o

10

employee other than the person designated by the Warden is authorized to initiate a purchase with the offender." Id. at 12. The directive adds that "[i]f possible, offender craft items should be returned to the offender and placed with piddling tools when the offender ... [l]oses piddling privileges." Id. A note announces that "[i]ncreased attention needs to be given to Special Orders pending when any of the above occurs." Id. Finally, the directive requires that each unit "must have an operational procedure outlining procedures for handling incoming and outgoing packages within the Craft Shop Program," which is to be posted in the craft shop. Id. at 13.

## V. DISCUSSION

Defendants move for summary judgment on grounds of Eleventh Amendment and qualified immunity. (D.E. 20, at 3-10). Plaintiff has filed a cross-motion for summary judgment, arguing that Defendants can be found liable on the basis of the evidence already submitted. (D.E. 25, at 3). In Defendants' response to Plaintiff's cross-motion for summary judgment, they contend that the evidence sufficiently "establish[es] that there was no causation and no intent to retaliate against Plaintiff." (D.E. 27, at 3). Plaintiff reiterates his position in his reply to the response, with emphasis on the allegation that Defendants permitted the purported violations for two years, and that the evidence thus demonstrates the sanctions were motivated by retaliatory intent. (D.E. 29).

### A.     The Legal Standard For A Summary Judgment Motion.

Summary judgment is appropriate when there is no disputed issue of material fact, and one party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Courts must consider the record as a whole, including all pleadings, depositions, affidavits, interrogatories and

admissions on file, in the light most favorable to the non-movant.  Caboni v. Gen. Motors Corp.,
278 F.3d 448, 451 (5th Cir. 2002) (citations omitted).

The party seeking summary judgment bears the initial burden of demonstrating the
absence of a genuine issue of material fact and informing the court of the basis for its motion by
identifying those portions of the pleadings, depositions, answers to interrogatories, admissions
on file, and affidavits, if any, which support its contention.  Celotex Corp. v. Catrett, 477 U.S.
317, 323 (1986); Williams v. Adams, 836 F.2d 958, 960 (5th Cir. 1988) (citation omitted).  Any
controverted evidence must be viewed in the light most favorable to the non-movant, and all
reasonable doubts must be resolved against the moving party.  See Lujan v. Nat'l Wildlife Fed'n,
497 U.S. 871, 888 (1990); Williams, 836 F.2d at 960 (citation omitted).

If the moving party makes the required showing, then the burden shifts to the non-movant
to show that a genuine issue of material fact remains for trial.  Matsushita Elec. Indus. Co. v.
Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); Fields v. City of S. Houston, 922 F.2d 1183,
1187 (5th Cir. 1991) (citation omitted).  The non-movant cannot merely rest on the allegations of
the pleadings, but must establish that there are material controverted facts in order to preclude
summary judgment.  Fed. R. Civ. P. 56(e); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-
49 (1986) (citation omitted).  Summary judgment is proper if the non-movant fails to make a
showing sufficient to establish the existence of an element essential to his case on which he bears
the burden of proof.  Celotex, 477 U.S. at 322-23; ContiCommodity Servs., Inc. v. Ragan, 63
F.3d 438, 441 (5th Cir. 1995) (citations omitted).

**B.      Defendants Are Not Entitled To Qualified Immunity.[4]**

The doctrine of qualified immunity affords protection against individual liability for civil damages to officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, __, 129 S. Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  When a defendant invokes the defense of qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense.  McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam) (citation omitted).  "To discharge this burden, a plaintiff must satisfy a two-prong test."  Atteberry v. Nocona Gen. Hosp., 430 F.3d 245, 253 (5th Cir. 2005).  "First, he must claim that the defendants committed a constitutional violation under current law."  Id. (citations omitted).  "Second, he must claim that defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of."  Id. (citations omitted).  While it will often be appropriate to conduct the qualified immunity analysis by first determining whether a constitutional violation occurred and then determining whether the constitutional right was clearly established, that ordering of the analytical steps is no longer mandatory.  Pearson, 555 U.S. at __, 129 S. Ct. at 818 (receding from Saucier v. Katz, 533 U.S. 194 (2001)).

---

[4] Defendants also invoke Eleventh Amendment immunity regarding any claims in their official capacity. (D.E. 30, at 3-4).  However, Plaintiff explicitly targets them in their individual capacity.  (D.E. 1-1, at 2). Nonetheless, if Plaintiff's action could be construed as suing them in their official capacity, that claim is necessarily against the State and, as such, is barred by the Eleventh Amendment.  See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993).

1.      **Step 1 – Plaintiff has established a constitutional violation.**

A prisoner's First Amendment right of access to the courts includes the right to seek redress through an established prison system.  See Jackson v. Cain, 864 F.2d 1235, 1248-49 (5th Cir. 1989).  Prison officials may not retaliate against a prisoner for exercising this right.  Woods v. Smith, 60 F.3d 1161, 1164 (5th Cir. 1995) (citations omitted).  Because it is well established that prison officials may not retaliate against a prisoner for exercising the right to file lawsuits and administrative grievances, actions that might not otherwise be offensive to the Constitution can give rise to a constitutional claim if taken in retaliation for the exercise of the protected conduct.  Id. at 1165 ("An action motivated by retaliation for the exercise of a constitutionally protected right is actionable, even if the act, when taken for a different reason, might have been legitimate.") (citations omitted).

To ultimately prevail on a § 1983 claim for retaliation, "'a prisoner must establish (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation.'"  Morris v. Powell, 449 F.3d 682, 684 (5th Cir. 2006) (quoting McDonald v. Steward, 132 F.3d 225, 231 (5th Cir. 1998)).  An inmate must allege more than his personal belief that he is the victim of retaliation.  Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997) (citation omitted).  "Mere conclusory allegations of retaliation will not withstand a summary judgment challenge."  Woods, 60 F.3d at 1166 (citation omitted).

The purpose of allowing retaliation claims pursuant to "§ 1983 is to ensure that prisoners are not unduly discouraged from exercising constitutional rights."  Morris, 449 F.3d at 686 (citing Crawford-El v. Britton, 523 U.S. 574, 588 n.10 (1998)).  However, some acts, even

14

though they may be "motivated by retaliatory intent, are so *de minimis* that they would not deter the ordinary person from further exercise of his rights." Id. "Such acts do not rise to the level of constitutional violations and cannot form the basis of a § 1983 claim." Id. For example, a job transfer from the commissary to the kitchen might be *de minimis*, while a transfer to a more dangerous unit might constitute an adverse retaliatory act. Id. at 687.

### a) Plaintiff has alleged a specific constitutional right.

Plaintiff alleges that Defendants imposed a series of unjustified sanctions upon him in retaliation for filing grievances. It is well-settled that a prisoner's First Amendment right of access to the courts includes the right to seek redress through an established prison system, see Cain, 864 F.2d at 1248-49, and equally well-settled that prison officials may not retaliate against a prisoner for exercising this right. See Woods, 60 F.3d at 1164. Plaintiff alleges actions clearly prohibited by the First Amendment as established by Cain and other longstanding precedent, and he has therefore sufficiently alleged a specific constitutional right.[5]

---

[5] Defendants believe that Plaintiff also alleges a claim that they unconstitutionally deprived him of his property in violation of his due process rights and committed unspecified Fifth Amendment violations. (D.E. 20, at 8-9). Although Plaintiff cites those amendments, his filings do not elaborate on them. To the extent he challenges the confiscation of his property, his complaint at present appears to be limited to a state law claim for unlawful conversion. (D.E. 25). The only specific Fifth Amendment claim he has elucidated is one of double jeopardy somehow relating to the tattoo charge. (D.E. 29-5). He has not made clear what the double jeopardy violation was, and a review of the record does not suggest he has a colorable double jeopardy claim. See Turner v. Johnson, 46 F. Supp. 2d 655, 666 (S.D. Tex. 1999) (prison disciplinary hearings do not implicate double jeopardy clause) (citations omitted). As for the Fourteenth Amendment, it is assumed that he relies upon it only insofar as it incorporates the First Amendment against the states. See Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 8 n.4 (2004) (First Amendment applies to the states by incorporation into the Fourteenth Amendment). In the alternative, to the extent his complaint could be construed as lodging a claim of unconstitutional deprivation of property without the due process afforded him by the Constitution, any such claim would require him to establish that he was given no adequate post-deprivation remedy. Hudson v. Palmer, 468 U.S. 517, 533 (1984). Because Defendants are holding the seized property securely until this action is resolved, (D.E. 24, at 3), he has not yet pursued post-deprivation remedies from TDCJ and any claim to that effect would not yet be ripe for judicial review. See Wilson v. City of Newark, No. 06-CV-5219, 2008 WL 834398, at *4 (D.N.J. Mar. 27, 2008) (unpublished) ("Even if a deprivation of Plaintiff's property has occurred, Plaintiff's § 1983 claim is not ripe because Plaintiff has not demonstrated that the State failed to provide due process through a post-deprivation remedy."). Defendants also suggest that Plaintiff has brought an access to courts claim pursuant to the First Amendment, (D.E. 20, at 9), but there is nothing in his filings to support that interpretation and thus he cannot prevail on that basis.

**b)    Plaintiff has sufficiently established retaliatory intent.**

Defendants submit that there is no indication of retaliatory intent.  (D.E. 20, at 7).  They argue that the evidence shows that Defendant Crites had no involvement in the drill press order. Id.  Defendant Hackman asserts that his conduct amounted to negligence at most, and that Plaintiff therefore cannot show retaliatory intent with respect to him either.  Id. at 7-8.  In Defendants' response to Plaintiff's motion for summary judgment, they emphasize that Plaintiff's initial "grievance did not involve any complaints against [Defendant] Crites," and suggest that this fact "puts a dent in Plaintiff's motion by establishing that [Defendant] Crites had no intent to retaliate against Plaintiff because of his grievance regarding the drill press order."  (D.E. 27, at 3).

Defendants' argument regarding the mail confusion is persuasive, but largely irrelevant. Although Plaintiff continues to insist that the original error involving his drill press order could not have been accidental, given the mailing system at the McConnell Unit and the lay-out of the mailboxes there, he does not make a compelling case.  (D.E. 25, at 4-5).  Whatever the intricacies of the mailing process at the unit, it is reasonable to assume that a prison official could indeed inadvertently send intra-prison forms to a company instead of the proper request form and check.  See Flournoy v. Kelly, Nos. 87-3135, 87-3172, 1988 WL 12137, at *2 (6th Cir. Feb. 18, 1988) (per curiam) (unpublished) (discussing innocent errors made by prison officials handling inmate mail).

Perhaps more importantly, even if this error was deliberate, it is unclear what would have provoked the retaliation.  At an earlier stage in the litigation, Plaintiff submitted records of grievances that he filed regarding his exclusion from the craft shop between 2003 and 2007.

(D.E. 11-1, at 2-17, 32-39).  But he is no longer stressing those grievances, and it seems unlikely at best that Defendant Hackman would retaliate against him for them by finally admitting him to the shop, waiting three years, and then sending the wrong forms to an equipment supply company.  See Walding v. United States, No. 08-CA-124, 2009 WL 890265, at *12 (W.D. Tex. Mar. 30, 2009) (emphasizing unexplained temporal gap between alleged incident giving rise to retaliatory intent and ultimate retaliatory act in prisoner civil rights action) (citing Allen v. Thomas, 388 F.3d 147, 150 (5th Cir. 2004)).  Indeed, in his first grievance regarding the mailing error, Plaintiff did not allege that he was being retaliated against for any grievances.  On the contrary, he appeared to suggest that he was being singled out as a result of personal animus and asked only that he not suffer "further harassment or reprisals of any kind."  (D.E. 20-3, at 14). Thus, Defendants are correct that there is no grounds to believe the initial error stemmed from retaliatory intent.

Nevertheless, the inquiry does not end there, because the mailing error is but a small fraction of Plaintiff's claim.  Instead, Plaintiff has consistently alleged a pattern of retaliation, citing a wide variety of retaliatory actions that center not on the drill press order mistake, but on the restrictions later imposed on his craft shop privileges and his commissary and recreation day restrictions.  (D.E. 1, 17, 25).  Moreover, he does not attribute these sanctions to his earlier grievances regarding initial entrance to the craft shop, linking them instead to the series of complaints he filed after the order form misstep.  Id.  Consequently, the crux of the matter is whether Plaintiff has shown any retaliatory intent during that later period.

Defendant Crites' insistence that he had no reason to share the alleged retaliatory intent of his co-defendant is less persuasive when the question is considered in this light.  For he

became involved in the events giving rise to this lawsuit at least as early as April 27, 2010, when he replied to the initial grievance.  (D.E. 20-3, at 14).  Even if he had no reason to share any retaliatory intent at that point, he surely did on May 2, 2010, when Plaintiff filed a grievance accusing him of penning a "false and misleading" response designed "to cover-up wrong doing." Id. at 26.

On a more basic level, Plaintiff's complaint has always focused on the allegedly improper extension of his suspension from the craft shop (and now his revocation), so Defendant Crites' argument that he had no involvement in the initial form mix-up is misplaced, as he has consistently defended the sanctions from the beginning.  Id. at 8, 14.  Finally, Mr. Dennis swears that he heard Defendant Crites discussing the alleged retaliatory scheme on April 16, 2010, (D.E. 25-1, at 2), and Plaintiff himself swears that a TDCJ official suggested to him that the tattoo charge resulted from irritation he caused Defendant Crites, (D.E. 25-2, at 2), further supporting the proposition that a material fact issue exists as to whether Defendant Crites possessed any retaliatory motive.  See Bibbs v. Early, 541 F.3d 267, 273-74 (5th Cir. 2008) (sworn statements from other inmates confirming plaintiff's account can help give rise to genuine issue of material fact so as to overcome qualified immunity defense in retaliation action); King v. Dogan, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam) (plaintiff's sworn statement is competent summary judgment evidence) (citation omitted).  In sum, to the extent Defendant Crites urges that he could not share any retaliatory intent, the argument is rejected, because a question of fact remains on that point.

The more difficult question remains, namely, whether Plaintiff sufficiently establishes that there was any retaliatory intent to share.  As the Fifth Circuit has acknowledged, "direct

evidence of [retaliatory] motivation" is hard to come by, so prisoners are required, in the absence of such evidence, to "'allege a chronology of events from which retaliation may plausibly be inferred.'" Woods, 60 F.3d at 1166 (citations omitted).  Plaintiff has not only alleged that chronology, it is supported by substantial evidence in the record and Defendants largely accept it.  He filed a grievance on April 12, 2010.  On April 15, 2010, he was punished for a tattoo that he has had for several years,[6] and suspended from the craft shop for a practice that he has maintained for two years.  As he continued to file grievances, the suspension became a revocation, and he lost his craft shop privileges entirely.  These facts, substantially undisputed by Defendants, constitute a chronology of events implying retaliation as enunciated in Woods.

Defendants' strongest argument for why retaliatory intent cannot be inferred is that Plaintiff was suspended and ultimately banned from the craft shop not because of his grievances, but because he violated TDCJ and McConnell Unit policies designed to ensure the security of the prison system.  (D.E. 27, at 2).  If the record reflected that narrative, they would make a strong case for qualified immunity.  See Hearn v. Arpaio, No. CV-03-1924, 2007 WL 1381616, at *5 (D. Ariz. May 9, 2007) (unpublished) (granting defendants' summary judgment on

---

[6] Defendants argue that Plaintiff has drawn no connection between them and the tattoo case, and that "any claims against them based on those allegations should be dismissed." (D.E. 20, at 8).  They are correct that the forms relating to the charge do not bear either defendant's name or signature.  Additionally, they are correct that civil rights claims must allege the personal involvement of the defendants, Thompson v. Steele, 709 F.2d 381, 382 (5th Cir. 1983) (citation omitted), or failing that supervisory liability such that a "causal connection" links the purported acts to "the constitutional violation sought to be redressed." Harvey v. Andrist, 754 F.2d 569, 572 (5th Cir. 1985) (citations omitted).  However, the tattoo case does fit squarely within Plaintiff's allegations of a series of retaliatory actions committed by various TDCJ employees and is therefore relevant for summary judgment purposes to establish such a pattern.  More importantly, Defendants are mistaken when they suggest that "[t]he evidence shows that Defendants Hackman and Crites had no involvement in the disciplinary charge and punishment." (D.E. 20, at 8).  Plaintiff swears in an affidavit that the TDCJ officer who charged him with the tattoo violation told him that he "should not have written Warden Crites up, because [he] pissed the Warden off." (D.E. 25-2, at 2).  Plaintiff's sworn statement is itself evidence for purposes of summary judgment.  See King, 31 F.3d at 346 (citation omitted).  He therefore sufficiently connects Defendant Crites to the tattoo case and the records relating to that case are relevant to the pending motions for summary judgment.

retaliation claim where inmate "violated the policies, and his actions represented a security concern").  The record here, however, does not support that account.

As a preliminary matter, Defendants' contention that "[w]hether [they] had knowledge of previous rule violations is irrelevant" fails.  (D.E. 27, at 2).  If Defendants knew for two years that Plaintiff was routinely sending leather and wooden goods out in the same packages, tolerated the practice for that period, and then only decided to cite him for the supposed violation shortly after he filed grievances, that fact would most certainly be relevant to the likelihood of retaliatory intent.  See Gwin v. Pyros, No. 09-527, 2009 WL 1269075, at *1 (W.D. Pa. May 6, 2009) (unpublished) (inferring retaliatory intent in a Fair Housing Amendments Act retaliation claim from defendant's adverse act immediately following complaint despite knowing of alleged violation for four months).  Defendants' failure to dispute Plaintiff's allegations in this respect, and the corroborating evidence represented by the craftwork receipts[7] establish a chronology from which retaliation can be plausibly inferred for purposes of the pending summary judgment motion.

Similarly, Defendants' belief that "[t]he facts are undisputed that the violation of a craft shop rule resulted in Plaintiff's suspension" is incorrect.  (D.E. 27, at 2).  Whether a violation of the rules resulted in the suspension, or whether it was alternatively the grievances that caused that outcome, is in fact one of the central disputes in this action.  Indeed, Plaintiff questions not only the causal connection between the rule and the suspension, he questions the very existence

---

[7] Although only a few items on these receipts explicitly indicate that they are leather, the receipts list several other objects that would routinely be made out of leather (e.g., purses and wallets).  (D.E. 25-4, at 4-5).  Furthermore, even if these objects were not made of leather (an assertion that Defendants nowhere make), it is difficult to imagine they were made out of wood, and Plaintiff would therefore still have been violating any regulation against sending out items from a different craft.

of the rule itself.  (D.E. 25-2, at 2) ("Prior to this incident and for approximately 2 years, I had been sending out craftshop items not pertaining to my craft.  All craftshop offenders are allowed to do this.").  Viewing the evidence in the light most favorable to Plaintiff, his skepticism in the validity of the supposed rules is grounded in the record for a number of reasons.

First, the supposed regulations that justified Plaintiff's sanctions do not appear in the administrative directive detailing craft shop policies, nor in any other document in the record. There are, in essence, two general craft shop policies at issue here: that craft shop workers cannot send out items made by others, (D.E. 24-1, at 3), and that they cannot send out items from other crafts, (D.E. 20-2, at 3), as well as several iterations and elaborations of these rules. Although TDCJ personnel reference these rules on numerous prison forms and court filings, there are precious few instances in which actual citations are provided.  In one, Defendant Hackman cited Section IV of the "Craftshop SOP[8] and A.D. 14.59" as support for the proposition that "[o]nly items made by the offender will be allowed to be sent out."  (D.E. 24-1, at 3).  If Defendant Hackman meant to reference Section IV of A.D. 14.59, that section appears to deal only with the prohibition on flammable objects, though it also contains a vague instruction that "[e]ach in-cell program shall be outlined in a unit/facility operational procedure." (D.E. 20-4, at 7).  This section does not address the existence of the policy that Defendant Hackman attributes to it.

---

[8] To the extent the craft shop has a formalized standard operating procedure that is independent from A.D. 14.59, there is no evidence of it in the record.  If Defendants seek to rely on a standard operating procedure that enumerates regulations not contained in the directive, they should have submitted records of those procedures.  See Celotex, 477 U.S. at 323.  In the absence of such records, Defendants' insistence on the existence of rules that are not articulated in official documents cannot be taken as true in light of the fact that Plaintiff denies the existence of those rules and submits evidence that they were unenforced for a lengthy period preceding his punishment.  See Lujan, 497 U.S. at 888.

In Defendants' motion for summary judgment, they note that the "'Warden may at any time revoke or suspend an offender's piddling privileges'" and that any "'[v]iolation of TDCJ's safety rules and regulations'" warrants that sanction.  (D.E. 20, at 6-7) (citing (D.E. 20-4, at 5)).  Neither provision suffices to justify the restrictions on Plaintiff's craft shop privileges for purposes of dismissing his retaliation claim.  There is no doubt that the warden can revoke piddling privileges, but he is not entitled to do so in retaliation for a prisoner's exercise of his First Amendment rights.  See Woods, 60 F.3d at 1165 (actions that might not otherwise be offensive to the Constitution can give rise to a constitutional claim if taken in retaliation for the exercise of the protected conduct).  Likewise, the broad authorization to suspend privileges because of violations is unquestioned, but does not, standing alone, justify the sanctions here.  For one thing, there must still be a "rule or regulation" violated, and Defendants have insufficiently demonstrated the existence of such a rule.

For another, it is far from clear that such a rule, if it existed, would invoke prison "safety" in any meaningful sense.[9]  The violations allegedly committed by Plaintiff have never been characterized by any TDCJ official as endangering himself or others.  Based on Defendants' detailed discussion of the sanctions, it is difficult to imagine that the security of the McConnell Unit was ever at stake.  (D.E. 24-1, at 3) (Defendant Hackman explaining that Plaintiff would have been allowed to send out the painted wood for which he was punished if he had himself done the painting, but noting that he had not).  Similarly, it is inconsistent to view Plaintiff's

---

[9] On March 21, 2011, Defendant Hackman defended the sanctions imposed on Plaintiff with reference to an alleged failure to keep a current tool inventory during a security audit some eighteen months prior.  (D.E. 24-1, at 3).  Plaintiff has provided no reason to doubt the veracity of that infraction, and it manifestly does invoke safety concerns.  Nevertheless, McConnell Unit employees were overwhelmingly focused on the rules regarding craft shop materials in their prison records.  Defendants sensibly share that focus in their filings, as those rules were used most immediately to justify the sanctions which form the basis of this lawsuit.  As such, the earlier offense will be assumed as true but does not alter the conclusions of the opinion.

working with different materials as an attempt to evade security measures when he was applying for permission to do so, month after month, for two years.  Furthermore, it would be illogical to suppose that prison officials themselves considered the issue a security concern, as they continually granted such permission.  This also undercuts Defendants' argument for the irrelevance of their prior awareness of the practice.

Defendants, in their prison records and their court filings, fail to point to any directive provisions prohibiting the targeted conduct.  An independent review of that directive was therefore conducted, though its results do not support their position.  First, there does not appear to be any provision concerning the sending out of items in unrelated crafts.  As for sending out items made by other inmates, the only language that could arguably apply is contained in the following clauses: "[a]ll craft sales between offenders are at the discretion of the Warden.  A sale may be prohibited by the Warden without justification to the offender.  A sale or trade of a craft item without approval is a trading and trafficking rules violation."  (D.E. 20-4, at 10).  Even these regulations, however, appear to govern only "craft sales between offenders," which does not address Plaintiff's alleged violation: sending out items that he co-produced while doing an insufficient amount of the work.  The arguably more serious allegation that he was improperly arranging for other inmates to export and sell their products through Ms. Campos' visits also does not fall within the rule, as such a transaction, whatever its propriety, would not truly be a "craft sale[] between offenders."

In the absence of any formalized regulations prohibiting Plaintiff's actions, the only place to look for the policy is in its articulation by the officials who sanctioned him.  Those articulations do not confirm the validity or existence of the rules prior to Plaintiff's encounter

with them, nor do they suggest that such rules needed to be created ex post facto after his

conduct.  They therefore further strengthen Plaintiff's argument that he was not punished for

their violation, but rather as retaliation.

One of the most detailed elaborations of the supposed rule is Defendant Hackman's

explanation that Plaintiff would have been well within his rights to send out a wooden object

with paint on it, so long as he did the painting, but that his failure to do so constituted a violation.

(D.E. 24-1, at 3).  This minor distinction, with no stated justification and no reasonable defense,

does not easily support the decision to deprive Plaintiff of the privilege to work in the craft shop.

Similarly, Defendant Hackman's description of the other policy, that an inmate is

permitted to purchase items unrelated to his craft and to work with another offender on a project,

but "only if the original craftsman purchased the material for his project and permission has been

granted by the Craftshop supervisor" does not support revoking Plaintiff's craft shop privileges.

Id.  Although one could see how the motivation behind such a policy might be more compelling

than that regarding the identity of the inmate who painted a wooden object, the distinction drawn

remains fairly inconsequential on its face.  Indeed, even if these rules (and the subsequent

nuances described) existed in any formal sense before their application to Plaintiff, it remains

strikingly incongruous that a detailed parsing of their meaning (and an elucidation of how

Plaintiff, if he had altered his conduct only slightly, would have been on the right side of them) is

followed immediately by the definitive statement that his conduct represented "wreckless [sic]

disregard to [sic] regulation."  Id.  Thus, assuming arguendo that the rules and their explanations

are reasonable, it is still a considerable stretch to claim that Defendants' alleged conduct showed

reckless disregard for them, as opposed to at most genuine confusion over their precise scope

and content.  See Davis v. City of Loganville, Ga., No. 3:04-CV-068, 2006 WL 826713, at *11 (M.D. Ga. Mar. 28, 2006) (unpublished) (discussing "the legal distinction between human error ... in complying with complex regulations versus the formulation of the requisite state of mind that amounts to reckless disregard"), aff'd 221 F. App'x 897 (11th Cir. 2007) (per curiam) (unpublished).  This is especially so given the fact that Plaintiff alleges, and the record reflects, that at least one of the purportedly prohibited practices had been allowed for two years prior with the knowledge of McConnell Unit officials.

Indeed, even when the suspension was initially handed down on April 15, 2010, it appears that the alleged violation was "detected" by virtue of Plaintiff's application for permission to give Ms. Campos the "contraband" leather.  An April 14, 2010 receipt lists five types of items explicitly made out of leather, and two types explicitly made out of wood.  (D.E. 25-4, at 5).  Instead of suspending an inmate for a "contraband" violation when he seeks permission to send out the supposedly prohibited material on an official prison form, the more natural response would have been to simply deny permission and inform him of the policy.  It is difficult to discern how Plaintiff's straightforward attempt to follow the rules can be labeled "reckless disregard" for such rules.

In sum, Plaintiff has pointed to sufficient evidence in the record to establish that Defendants' explanations for the restrictions were pretextual.  They do not dispute that Plaintiff was disciplined for a tattoo three days after he filed a grievance, nor do they dispute his contention that he had the tattoo for several years earlier.[10]  They concede that he was suspended

---

[10] Major Villarreal asserted on a prison form that Plaintiff admitted he acquired the tattoo recently and that his travel card did not document it.  (D.E. 20-5, at 3-5).  Defendants do not address the question in their filings, nor do they provide the travel card as evidence.  The evidence in the record suggests that Plaintiff consistently claimed that the tattoo was several years old even before the filing of this lawsuit.  (D.E. 20-3, at 11; D.E. 20-5, at 3).  Both

from the craft shop on the same day, and decline to contradict his assertion, supported by evidence, that the practice supposedly justifying the punishment was one long acknowledged and condoned by officials at the McConnell Unit.  They point to no evidence demonstrating that the supposed rules existed prior to their enforcement in Plaintiff's case, and the explanations offered over time for his treatment do not reasonably support the serious penalties inflicted.[11]  Lastly, there is competent summary judgment evidence that speaks directly to the existence of retaliatory intent in sworn statements by Plaintiff and Mr. Dennis.  Plaintiff has alleged a chronology from which retaliatory intent can be plausibly inferred, and the evidence in the record supports his account for purposes of addressing the competing motions for summary judgment.

### c)      Plaintiff has sufficiently established retaliatory adverse acts.

Plaintiff alleges that Defendants orchestrated a retaliatory scheme that resulted in the loss of commissary and recreation days, as well as the suspension and ultimate revocation of his privileges at the craft shop, which he labored to earn over at least three years.  The record reflects that he did in fact suffer these sanctions.  Defendants do not argue that he insufficiently establishes that the acts he suffered were adverse and more than de minimis, and there is no

---

Ms. Campos and Jose Medina, a fellow inmate, swear that he had the tattoo for a lengthy period of time prior to the disciplinary citation.  (D.E. 28-3, 4).  This conflicting evidence creates a genuine issue of material fact that cannot be assumed away at summary judgment. See Lujan, 497 U.S. 871 at 888.

[11] It is also worth noting in this regard that Plaintiff's complaint that he was never presented with any official documentation setting the length or terms of his initial suspension, (D.E. 20-3, at 11-12), appears to remain justified even now, after Defendants' submitted their summary judgment evidence.  Indeed, it is striking that the only documents even mentioning Plaintiff's initial craft shop offense are records compiled significantly later and regarding the other alleged violations, most of which were prepared in response to his complaints or in court-filings.  This absence further bolsters Plaintiff's argument that his initial sanctions were imposed for pretextual reasons.  See Cantu v. Vitol, Inc., No. H-09-0576, 2011 WL 486289, at *13 (S.D. Tex. Feb. 7, 2011) (unpublished) ("While a lack of documentation is insufficient, standing alone, to establish pretext, ... it does provide evidence of pretext.") (discussing Title VII retaliation case) (citing Mire v. Texas Plumbing Supply Co., Inc., 286 F. App'x 138, 143-44 (5th Cir. 2008) (per curiam) (unpublished)).

reason to so hold.  See Andrade v. Hauck, 452 F.2d 1071, 1071-72 (5th Cir. 1971) (restriction of commissary privileges is not de minimis in a prisoner retaliation claim); see also Thornton v. Merchant, No. H-10-616, 2011 WL 147929, at *14 (S.D. Tex. Jan. 18, 2011) (unpublished) (allegation of retaliatory refusal to reinstate inmate's craft shop privileges sufficiently states a claim of retaliation for purposes of preliminary screening, in part because "craft shop privileges are very desirable and highly sought after").  The punishments imposed on Plaintiff "might well 'chill or silence a person of ordinary firmness from future First Amendment activities,'" and Plaintiff therefore satisfies this element of the retaliation inquiry.  Bibbs, 541 F.3d at 272 (quoting Morris, 449 F.3d at 685).

> **d)     Plaintiff has sufficiently established causation.**

Defendants argue that there is no evidence of causation because Plaintiff was punished not for filing grievances but for violating TDCJ policy by sending out leather when he was only allowed to send out woodwork.  (D.E. 20, at 6-7.)  For the same reasons that Plaintiff sufficiently establishes the existence of retaliatory intent for purposes of the summary judgment motion, he establishes causation: that Plaintiff was disciplined for a years-old tattoo three days after he filed a grievance, that he was suspended from the craft shop on the same day for a practice long acknowledged and condoned by TDCJ, that there is no evidence the rules cited for his punishment exist, and that their justifications, and the explanations for their application to his case, are weak.  Because these facts support Plaintiff's view that the cited reasons for sanctions were pretextual, they support in equal measure his argument that the driving force behind the penalties was discontent with his grievances.  Defendants have advanced no alternative explanation for the sanctions, and given the temporal proximity between them and the

grievances, and the fact that the only evidence suggesting an alternative explanation is Mr.

Hunt's and Plaintiff's sworn statements that TDCJ officials openly discussed the alleged

retaliatory scheme, (D.E. 25-1-2), irritation with the complaints is the only explanation supported

by the competent summary judgment evidence.  See Bibbs, 541 F.3d at 272-74 (sufficient

evidence of causation to overcome qualified immunity and survive summary judgment in a

prisoner retaliation claim where defendants committed adverse acts within a month of last

grievance and where plaintiff and other inmates swore in affidavits that defendants had admitted

to retaliatory motives).  Accordingly, Plaintiff sufficiently establishes causation, sufficiently

establishes the other three elements of retaliation, and therefore satisfies his burden on the first

prong of the qualified immunity analysis.

### 2.    Step 2 – Plaintiff has sufficiently shown that Defendants acted objectively unreasonable.

Because Plaintiff meets his burden on the first step of the qualified immunity inquiry, it is

necessary to examine the second.  At this juncture, a plaintiff must articulate the asserted

constitutional right more specifically.  Thompson v. Upshur County, Tex., 245 F.3d 447, 460

(5th Cir. 2001).  Thus, "when the defendant moves for summary judgment based on qualified

immunity, it is the plaintiff's burden to demonstrate that all reasonable officials similarly situated

would have known that the alleged acts of the defendants violated the United States

Constitution."  Id. (citation omitted).  For a right to be clearly established under the second step

of the qualified immunity analysis, "[t]he contours of the right must be sufficiently clear that a

reasonable officer would understand that what he is doing violates that right."  Anderson v.

Creighton, 483 U.S. 635, 640 (1987).

Under the second step, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202 (citing Wilson v. Layne, 526 U.S. 603 (1999)). Even officers who interpret the law mistakenly but reasonably are entitled to immunity. See Creighton, 483 U.S. at 641. The purpose of the "clearly established law" requirement is to avoid retroactive application of "newly created legal standards" to state actors who had no reason to know they were exposing themselves to liability. Mouille v. City of Live Oak, Tex., 977 F.2d 924, 928 (5th Cir. 1992) (citing Harlow, 457 U.S. at 819).

Defendants insist that their actions were objectively reasonable because Plaintiff was suspended for violating TDCJ policy and because the problems regarding the drill press resulted from innocent confusion, not bad faith or malice. (D.E. 20, at 10). However, there are no grounds to regard their actions as objectively reasonable for purposes of their motion for summary judgment once Plaintiff's account is accepted as generally supported by the evidence. Plaintiff claims that Defendants subjected him to a series of harsh and unjustified punishments in retaliation for his filing of grievances. The right to be free from retaliation for the use of a prison grievance system was well-established at the time of the events relevant to this action. See, e.g., Woods, 60 F.3d at 1164. Because the summary judgment evidence could be viewed by the trier of fact to support Plaintiff's account of Defendants' actions, they acted objectively unreasonable, and he satisfies his burden on the second prong of the qualified immunity inquiry. Defendants are therefore not entitled to qualified immunity.

**C.**    **Plaintiff's Cross-Motion For Summary Judgment Is Denied.**

Plaintiff sufficiently demonstrates that Defendants are not entitled to qualified immunity. Nevertheless, he fails to show that no genuine issues of material fact remain as to the merits of his claim.  Although the evidence in the record at present tends to support his view that the reasons propounded for his sanctions were pretextual, it does not prove by a preponderance of the evidence that Defendants possessed the requisite mental state to warrant the imposition of liability.  That finding will likely turn on an examination of their credibility, a question for a trier of fact at trial.  See generally Clarke v. Stalder, 121 F.3d 222, 231 (5th Cir.) (discussing determination at trial of retaliatory intent in a prisoner civil rights action), vacated on granting rehearing en banc by 133 F.3d 940 (5th Cir. 1997), then reinstated in relevant part by 154 F.3d 186 (5th Cir. 1998) (en banc).  Accordingly, Plaintiff's cross-motion for summary judgment, (D.E. 25), is denied.

**D.**    **Plaintiff's Motion For A Preliminary Injunction Is Denied As Moot.**

The only relief Plaintiff sought in his motion for a preliminary injunction was "that ... Defendants be prevented from disposing of [his] craftshop tools and materials ... until the lawsuit has been resolved."  (D.E. 17, at 4).  They have offered assurance that they will do so.  (D.E. 24, at 3).  Accordingly, Plaintiff's motion for a preliminary injunction is denied as moot.  See Williams v. Ballard, 466 F.3d 330, 334 (5th Cir. 2006) (per curiam) (request for injunctive relief rendered moot by defendant's promise to provide relief sought).

**E.**    **Plaintiff's State Law Claim Of Conversion Will Proceed To Trial.**

Defendants move for summary dismissal of Plaintiff's claim of state law conversion, arguing, as their only ground, that "[w]hen a plaintiff fails to assert a valid federal claim, it is the

general rule to dismiss any pendent claims." (D.E. 20, at 9). Plaintiff does assert a valid federal claim and this rule, though correct, is therefore inapplicable to the case.

Pendent jurisdiction may be exercised by a federal court over a state law claim when the plaintiff presents a substantial federal claim and when the "state and federal claims ... derive from a common nucleus of operative fact." United Mine Workers of America v. Gibbs, 383 U.S. 715, 725 (1966). Even when these two conditions are met, however, the exercise of such jurisdiction remains within the court's discretion, and it should only be exercised after weighing "'the values of judicial economy, convenience, fairness, and comity.'" Parker & Parsley Petroleum Co. v. Dresser Indus., 972 F.2d 580, 586 (5th Cir. 1992) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)).

As a preliminary matter, Defendants do not argue that Plaintiff's conversion claim should be dismissed on the merits. Furthermore, even if their argument for qualified immunity was construed as an argument for dismissal of the conversion claim on the same grounds, that argument would be rejected. Pursuant to Texas state law, the common law tort of conversion is committed by "'[t]he unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights.'" Arthur W. Tifford, PA v. Tandem Energy Corp., 562 F.3d 699, 705 (5th Cir. 2009) (quoting Waisath v. Lack's Stores, Inc., 474 S.W.2d 444, 447 (Tex. 1971)). There need not be "'a manual taking of the property in question'" but "the defendant's actions must impair the plaintiff's ownership interest." Id. (quoting Waisath, 474 S.W.2d at 447 and citing Prewitt v. Branham, 643 S.W.2d 122, 123 (Tex. 1982)). A showing of conversion requires a plaintiff to prove: "(1) he legally possessed the property or was entitled to it; (2) the defendant wrongfully

31

exercised dominion and control over the property, excluding the plaintiff; (3) the plaintiff

demanded the property's return; and (4) the defendant refused."  Id. (citing Small v. Small, 216

S.W.3d 872, 877 (Tex. App. 2007)).

No one disputes that Plaintiff legally possessed the property, and given that he was

evidently paying for his equipment with his own money such a claim would be difficult to

maintain.  His grievances clearly expressed a desire to return to the craft shop and resume using

his tools, and thus constituted a demand for the return of his property.  Defendants refused that

demand.  Their seizure and confiscation of Plaintiff's tools, though temporary, still represents an

assumption of dominion and control such that they impaired his ownership interest.  See United

States v. Va Lerie, 424 F.3d 694, 703 (8th Cir. 2005) (en banc) ("'[t]he gist of conversion is the

interference with the control of the [owner's] property'") (citation omitted).

Finally, because Plaintiff has sufficiently demonstrated for qualified immunity purposes

that genuine issues of material fact remain as to the legality of the seizure, he also demonstrates

that such issues remain with respect to whether the confiscation was done in an unlawful and

unauthorized manner for purposes of his conversion claim.  See Little v. Fulps, No. 05-02-827-

CV, 2002 WL 31831367, at *1 (Tex. App. Dec. 18, 2002) (unpublished) (holding that plaintiff

did not satisfy unlawful and unauthorized prong where seizure was done pursuant to "facially

valid court order [and] in accordance with its terms" and thus implying that citing legal authority

for seizure does not justify summary judgment where such authority is questionable).  Thus, the

conversion claim would survive summary judgment even if challenged on the merits.[12]

---

[12] It should also be noted that the fact that the property has only been seized temporarily, with the
possibility of its return to either Plaintiff or his family, would not necessarily bar his claim for damages under the
tort of conversion.  See Wiese v. Pro Am Servs., Inc., 317 S.W.3d 857, 862 (Tex. App. 2010) ("A plaintiff who
establishes conversion is entitled to either (1) the return of the property and damages for its loss of use during the

Turning to the question of whether pendent jurisdiction is merited, Plaintiff alleges that Defendants imposed significant penalties on him in retaliation for exercising his First Amendment rights.  The record supports his allegations and he has therefore presented a substantial federal claim.  See Union City Barge Line, Inc. v. Union Carbide Corp., 823 F.2d 129, 142 (5th Cir. 1987) ("For purposes of pendent jurisdiction, 'substantiality' is determined by whether the federal claims are more than frivolous.") (citations omitted).  Plaintiff's retaliation claim and his conversion claim flow, to a certain extent, from some different acts on the part of Defendants.  In particular, the retaliation claim relies upon all of the alleged adverse acts committed by Defendants whereas the conversion claim is focused only on the acts involving the seizure of his property.  Nevertheless, the two claims are grounded on the same essential events: the punishment he endured in response to the filing of grievances.  Indeed, even the other sanctions are relevant to the seizure of his property to the extent that they were based on his purported earlier violations, and thus helped lay the groundwork for the ultimate revocation that resulted in the indefinite seizure of his property.  Consequently, the two claims derive from a common nucleus of operative facts, and pendent jurisdiction is therefore permissible.  See City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 165 (1997) (interpreting common nucleus broadly as encompassing events arising from a single endeavor by defendant).

In addition, all of the factors bearing on the exercise of pendent jurisdiction weigh in favor of its exercise.  Because the retaliation claim is proceeding to trial in federal court, and because his allegations of conversion are closely aligned with that claim, it furthers judicial economy and convenience to air both claims in the same forum.  See Metro Ford Truck Sales,

---

time of its detention or (2) the value of the property.") (citations omitted) (emphasis added).

Inc. v. Ford Motor Co., 145 F.3d 320, 328 (5th Cir. 1998) (suggesting that when federal "claim is so intertwined with the state law claims as to be difficult to treat separately," they ought to be heard in the same court).  Similarly, the interest of fairness is better advanced if the claims are resolved earlier, and in the same court, than if Plaintiff were forced to refile in state court.  See Cinel v. Connick, 15 F.3d 1338, 1345 (5th Cir. 1994) ("[T]here is a close relationship between the issues and the facts underlying the state and federal claims.  Thus, the principles of judicial economy and fairness weigh heavily in favor of the district court's disposal of the pendent claims on the merits.").  Lastly, there is no reason to suppose that comity between the state and federal judiciaries would be frustrated by the exercise of pendent jurisdiction, particularly considering that the conversion claim appears fairly straightforward and therefore presumably does not implicate any notably complex or novel questions of state law.  See Batiste v. Island Records, Inc., 179 F.3d 217, 227 (5th Cir. 1999) (citations omitted).  Accordingly, Plaintiff's state law claim of conversion is retained and will proceed to trial along with his federal constitutional claim of retaliation.

**F.    Defendants' Motion For Summary Judgment Is Denied In All Respects.**

Because Defendants do not propose any genuine issues of material fact outside of their arguments for qualified immunity, and because the state law claim of conversion will not be dismissed, their motion for summary judgment is denied in all respects.  See, e.g., Peele v. Twp. of W. Deptford Police Dep't, No. 09-2267, 2011 WL 550617, at *8 (D.N.J. Feb. 9, 2011) (unpublished) ("for the same reasons that Cramer is not entitled to qualified immunity at this juncture, summary judgment on Plaintiff's § 1983 claim is denied").

34

It is important to be mindful that prison officials deserve considerable deference in the exercise of their often difficult duties, and that courts should take care not to intrude unnecessarily on the construction and implementation of correctional policies.  See Freeman v. Tex. Dep't of Criminal Justice, 369 F.3d 854, 863 (5th Cir. 2004) ("the Court is equally cognizant of the inherent demands of institutional correction, the deference owed to prison administrators, and the subjugation of individual liberty that lawful incarceration necessarily entails") (citation omitted).  The decision to pry into such affairs, by an institution ill-equipped to micromanage the prison system, should never be taken lightly.  That said, "inmates do not forfeit all constitutional rights when they pass through the prison's gates."  Id. (citation omitted).  It is true, as Defendants say, that "prisoners cannot shield themselves from disciplinary action under the pretext of retaliation," but by the same token officials cannot shield themselves from legal responsibility for unconstitutional conduct under the pretext of appropriate disciplinary action. (D.E. 20, at 6).  When a prisoner is punished with reference to a policy that appears only to exist in its application to him, and one which seems to perpetually evolve in response to his supposed conduct, there is a question of material fact warranting the denial of summary judgment.

## G.   Plaintiff's Motion To Amend Is Granted In Part And Denied In Part.

Plaintiff moves for leave to amend his complaint in order to add retaliation claims against individuals he identifies as Officer Miereles and Warden Guterrez.[13]  (D.E. 28).  He alleges that Officer Miereles wrote a disciplinary case against him on May 5, 2011, for a tattoo on his left finger that he has had for over ten years.  Id. at 1.  Plaintiff further alleges that Warden Guterrez

---

[13] Plaintiff spells this individual's name "Guitterrez."  It is assumed that he is referring to Warden Guterrez, given his involvement in the alleged incident forming the basis of the amended claim against him.  (D.E. 24-1, at 3).

ordered Defendant Hackman to give him a disciplinary case on March 17, 2011 for sending out

an item with both wood and metal on it, despite the fact that leather workers are allowed metal

belt buckles and the fact that the same item for which he is being punished has been sent out

before.  Id. at 1, 3.  He attaches affidavits from Ms. Campos, who swears he has had the tattoo

for over ten years,[14] (D.E. 28-3), and Jose Medina, a fellow inmate, who swears that he has had

the tattoo for at least twenty months.  (D.E. 28-4).

Defendants oppose the motion to amend, arguing that "it is prejudicial to [them] and the

new claim as well as defendants will result in confusion as it does not arise out of the same

events or occurrences at issue."  (D.E. 30, at 2).  They further contend that because of the

advanced stage of the litigation, "an amendment would be prejudicial to defendants and would

delay the proceedings in this case."  Id.  Defendants note that adding defendants would extend

the discovery period and result in a new dispositive motion deadline.  Id.  Finally, they urge that

the motion be denied because it does not "relate back" to the original complaint, submitting that

"it does not involve the same core facts of the original complaint," but instead "involves events

occurring this year rather than last year" as well as implicating different officials.  Id. at 3.

Although Plaintiff styles his filing a motion to amend, it concerns events that occurred

after the filing of his initial complaint.  (D.E. 28).  As such, it is properly construed as a motion

to supplement the complaint rather than a motion to amend.  See Dean v. Ford Motor Credit Co.,

---

[14] Ms. Campos references a photograph taken of her and Plaintiff at prison visitation in September 2009, which she claims shows the finger tattoo.  (D.E. 28-3).  Although she cites "Exhibit A" as the location of that image, the attached document with that notation is a photograph taken on April 15, 2010 as part of the investigation into the allegedly undocumented tattoo on Plaintiff's arm.  (D.E. 28-5).  The only other photograph attached to the motion to amend is an unidentified photograph of an individual whose face is entirely obscured, and whose fingers are not visible.  (D.E. 28-1).  Similarly, Plaintiff claims in an affidavit that photographic evidence demonstrates that McConnell officials knew of the finger tattoo when they punished him for the arm tattoo.  (D.E. 29-5).  The only new photograph attached to the reply is likewise too blurry to make out any tattoos, and does not appear to have captured his arms or fingers in any event.  (D.E. 29-7).

885 F.2d 300, 302 (5th Cir. 1989) (citation omitted).  Rule 15(d) of the Federal Rules of Civil

Procedure provides that "[o]n motion and reasonable notice, the court may, on just terms, permit

a party to serve a supplemental pleading setting out any transaction, occurrence, or event that

happened after the date of the pleading to be supplemented."  Fed. R. Civ. P. 15(d).  The Fifth

Circuit has indicated that the same factors that shape a Rule 15(a) inquiry apply to Rule 15(d).

See Chemetron Corp. v. Business Funds, Inc., 682 F.2d 1149, 1194 (5th Cir. 1982) (citation

omitted), vacated on unrelated grounds by 460 U.S. 1007 (1983); cf. United States v. Hicks, 283

F.3d 380, 385 (D.C. Cir. 2002) ("courts often simply apply the principles of 15(c) to

supplemental pleadings") (citing decisions from Fourth and Seventh Circuits).  These factors

include undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to

cure deficiencies by amendments granted earlier, undue prejudice to the opposing party, and

futility.  Chemetron, 682 F.2d at 1194 (citations omitted).  Leave to supplement should not be

granted where a plaintiff attempts to present "new and different cause[s] of action."  Griffin v.

Cnty. Sch. Bd. of Prince Edward Cnty., 377 U.S. 218, 226 (1964).  However, if he does not, and

if no other "substantial reason" mandates denying leave, the motion should be granted.

Chemetron, 682 F.2d at 1194 (citation omitted).

There has been no undue delay, bad faith, dilatory motive, or repeated failure to cure

deficiencies by Plaintiff.  However, his motion to amend is futile insofar as it seeks to add a

claim against Officer Miereles for the May 5, 2011 disciplinary case, because he plainly could

not have exhausted his administrative remedies with respect to that claim in the single week that

elapsed between the incident and his submission of the instant motion.  See Ford v. Register, No.

3:10-CV-390, 2010 WL 5678669, at *5 (N.D. Tex. Dec. 23, 2010) (unpublished) (motion to

amend prisoner civil rights complaint futile where claim unexhausted) (citations omitted), adopted by 2011 WL 323575 (N.D. Tex. Jan. 31, 2011) (unpublished); see also Johnson v. Johnson, 385 F.3d 503, 517 (5th Cir. 2004) (for exhaustion purposes, a prisoner's complaint about a correctional officer's actions should identify and grieve the conduct of that specific person).

Turning to the claim against Warden Guterrez, the summary judgment record has already been liberally construed to encompass events that occurred well after the filing of the original complaint, under the theory that Plaintiff has permissibly expanded the scope of his claims over the course of litigation, and the theory that such events shed light on the pattern of retaliatory conduct allegedly engaged in by Defendants. However, to stretch the record to include acts committed by a defendant only now being named would cause undue prejudice. If the amendment were allowed, Defendant Guterrez would be required to defend himself in an action filed nearly six months before he committed the purported act that made him a party to the constitutional violation. In other words, he would then be defending himself in an action centrally based on allegations that Plaintiff does not even now level at him. Defendants' contention that such an amendment would cause undue prejudice and confusion is therefore well-taken. (D.E. 30, at 2).

Moreover, it is exceedingly likely that the claim against Warden Guterrez would be futile as well, given that considerable evidence is already in the record regarding the incident that forms the basis of Plaintiff's amended claim against him, and none of that evidence suggests that Warden Guterrez ordered Defendant Hackman to issue the disciplinary case, or otherwise shared or acted on any retaliatory intent. It is unclear where Plaintiff would, at this stage, have gotten

additional evidence concerning the case and equally unclear why, if he has, he does not present it with the motion to amend.  As a result, the most logical conclusion to draw is that the claim is based on nothing more than an unsupported belief, that it would therefore not survive summary judgment, and that it is consequently futile.  See Dewitt v. Proctor Hosp., 517 F.3d 944, 949 (7th Cir. 2008) (motion to amend properly denied where additional claim would be dismissed at summary judgment).

Lastly, Defendants' concern that the incorporation of new parties would postpone litigation when it has already reached an advanced stage is a well-founded one.  A significant amount of discovery has already taken place and the addition of two new defendants would likely cause a substantial delay in resolving this action.  See Bamm, Inc. v. GAF Corp., 651 F.2d 389, 391-92 (5th Cir. Unit B July 1981) (per curiam) (court may properly consider stage of discovery process in ruling on motion to amend); see also Feldman v. Am. Mem'l Life Ins. Co., 196 F.3d 783, 793 (7th Cir. 1999) (motion to amend to add new defendant properly denied where filed "on the eve of summary judgment proceedings" because it would prejudice new defendant and delay proceedings with original defendant).

Because the claims against Officer Miereles and Warden Guterrez are both futile and delaying, and because the claim against Warden Guterrez is in addition unduly prejudicial, the motion to amend is denied with respect to Plaintiff's request to add those two individuals as defendants.  If he wishes to pursue a civil rights claim against either or both, he should file a separate lawsuit or lawsuits after properly exhausting his administrative remedies through TDCJ's grievance process.

Although the allegations regarding Officer Miereles and Warden Guterrez are insufficient to add them as defendants, the motion to amend does assert facts, and present evidence, relevant to the claims against Defendants Crites and Hackman.  In particular, the sworn statements from Ms. Campos and Mr. Medina that Plaintiff had both tattoos for a lengthy period of time before he was sanctioned for either lends support to his argument that he has been given a long series of punishments on the basis of purely pretextual reasons.  Moreover, the allegation that he has now been disciplined for a second "undocumented" tattoo on the same arm as the first, in a more visible location, and more than a year later, suggests that both sets of sanctions may have been driven by improper motivations.  Because Plaintiff establishes the likelihood of Defendants possessing and acting on retaliatory intent, because of the close relationship between the two punishments, and because he links Defendants to the earlier tattoo case, it can be reasonably inferred that the second tattoo "infraction" is part of the retaliatory campaign led by Defendants.  Finally, and more simply, the allegations in the motion to amend concerning the March 17, 2011 infraction are clearly relevant to the overall retaliatory scheme that Plaintiff alleges.

On the whole, therefore, the motion extends Plaintiff's account of the retaliation against him, and consequently fits within the purposes of Rule 15(d).  See Brodheim v. Cry, No. 2:02-cv-573, 2010 WL 3943558, at *1-2 (E.D. Cal. Oct. 7, 2010) (unpublished) (motion to supplement granted where it alleged facts tending to show ongoing pattern of retaliatory conduct by prison officials subsequent to filing of initial complaint).  Considering the allegations in the motion to amend as flowing from the overall retaliatory scheme Plaintiff complains of, supplementation is appropriate.  See Griffin, 377 U.S. at 226-27 (motion to supplement properly

granted where it alleged that defendant continued to engage in illegal acts related to the initial complaint).

Amendment in this respect will not unduly prejudice Defendants, given that Plaintiff brought forth sufficient factual allegations and evidence in his previous filings to survive summary judgment and qualified immunity, and the action would therefore have proceeded to trial without the supplement.  Nor will it cause any delay, as no additional responses from Defendants are required and the discovery and trial schedule will proceed apace.  None of the other factors bearing on motions to amend or supplement suggest that any "substantial reason" exists to deny the motion.  Accordingly, Plaintiff's motion to amend, construed as a motion to supplement, is therefore granted with respect to these factual allegations and supporting attachments.[15]

---

[15] The parties should note that the motion is granted only so as to clarify the scope of the controversy as it proceeds to trial.  This Order expresses no view on the ultimate relevance or competence of these allegations and evidence at trial, an issue that Defendants may raise at the appropriate juncture.

## VI.  <u>CONCLUSION</u>

For the reasons set forth above, Defendants' motion for summary judgment, (D.E. 20), is DENIED in all respects, as are Plaintiff's motions for summary judgment, (D.E. 25), and for a preliminary injunction.  (D.E. 17).  Plaintiff's motion to amend the complaint, (D.E. 28), is converted into a motion to supplement and is DENIED in part and GRANTED in part consistent with this Order.

ORDERED this 16th day of June 2011.

_____
BRIAN  L. OWSLEY
UNITED STATES MAGISTRATE JUDGE